COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:   Chief Judge Decker, Judges Beales and Lorish
Argued at Richmond, Virginia


PETER WARREN CHARLES

                                             MEMORANDUM OPINION* BY
v.        Record No. 0575-23-2                JUDGE RANDOLPH A. BEALES
                                                  AUGUST 20, 2024

COMMONWEALTH OF VIRGINIA


            FROM THE CIRCUIT COURT OF CHESTERFIELD COUNTY
                        M. Duncan Minton, Jr., Judge

            Todd M. Ritter (Hill & Rainey, Attorneys at Law, on brief), for
            appellant.

            Aaron J. Campbell, Assistant Attorney General (Jason S. Miyares,
            Attorney General, on brief), for appellee.


        Following a jury trial, the Circuit Court of Chesterfield County convicted Peter Warren

Charles of abduction under Code § 18.2-47.  On appeal, Charles argues that the evidence was

insufficient to support his conviction.  He also contends that the trial court erred by "failing to

directly answer a jury question regarding the definition of legal 'excuse' contained in the instruction

defining the crime of abduction."  In addition, Charles argues that the trial court erred by "excluding

the defense presentation of a certain photograph of the alleged victim to counter [the]

Commonwealth's theory that the alleged victim was handcuffed involuntarily."

                                    BACKGROUND

        "In accordance with familiar principles of appellate review, the facts will be stated in the

light most favorable to the Commonwealth, [as] the prevailing party at trial."  *Scott v.*

---

* This opinion is not designated for publication.  *See* Code § 17.1-413(A).

*Commonwealth*, 292 Va. 380, 381 (2016). In doing so, we must "discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom." *Parks v. Commonwealth*, 221 Va. 492, 498 (1980) (internal quotation marks omitted).

In late 2020, J.S.[1] was 18 years old, was struggling with heroin addiction, had no money, and did not have a permanent home. In November of that same year, J.S. met Peter Warren Charles online and he offered to let her move into his house. J.S. accepted, and she agreed to abide by the ground rules of her staying in his home that Charles set for her. Charles expected J.S. to respect his property and to avoid certain areas of the house. J.S. had a cell phone that could access the internet, but Charles would cut off internet access in his home periodically when he believed J.S. was misbehaving. In addition, J.S. testified at trial that she allowed Charles to place handcuffs on her hands during days when she was alone "to make him feel safer about me being at the house while he was at work."

At trial, J.S. also described the security cameras that Charles had installed inside his home. Through the cameras, Charles could see and hear J.S. in the house, and they could speak to each other. One of the cameras was installed in J.S.'s bedroom. Charles also showed J.S. the numerous firearms that he kept in the house.

On weekday mornings, Charles drove J.S. to a methadone clinic to treat her heroin addiction. On Fridays, she received two doses of methadone in a lockbox to take home for the weekend. Charles held onto the lockbox, and he dispensed the methadone to J.S. when she asked. Charles also gave J.S. alcohol and Xanax pills to help alleviate the symptoms of her heroin addiction.

---

[1] We use initials, instead of the victim's name, in an attempt to better protect her privacy.

In late December of 2020, J.S. left Charles's house for two days to stay with a friend for Christmas. She returned to Charles's house because, she testified, "all my stuff was there." Upon her return, J.S. testified, "Things were a little more tense between us because he had really wanted me to come back and didn't want me to leave again." She noted that Charles "was keeping an eye on me more than usual." On Thursday, December 31, 2020, Charles took J.S. to get her methadone for the long holiday weekend.

According to J.S.'s testimony, once the two returned home from the clinic that New Year's Eve evening, they began arguing about the methadone. J.S. then "made a decision in my head that I wanted to leave," and she wanted to "go to the same friends that I had gone for Christmas." She recounted, "I packed a bag," but then "me and Peter [Charles] got into an argument about it." She told Charles that she wanted to leave at that time. However, she testified, "He [Charles] said no." J.S. confirmed that she physically tried to leave the house after telling Charles that she wanted to leave, but then stated, "He stepped in between me and the door."

Later that same evening, Charles told J.S. to go into the bathroom, and then he locked her inside. J.S. testified that Charles "had me handcuffed and then tied a rope to the handcuffs" and that the rope ran under the bathroom door and was tied to Charles's bed. She then described, "He handcuffed me and he slept in front of the bathroom door on the lower floor." While she was in the bathroom, J.S. testified, she "[a]rgued with Peter [Charles] some" about "letting me out." When the attorney for the Commonwealth asked, "At some point were you allowed to leave the bathroom," J.S. answered, "Yes, the – the next morning." On redirect examination, J.S. explained why she could not leave the bathroom that night: "I couldn't leave because I had the handcuffs on which were roped under the door to his bed. I couldn't leave because the doors were locked, and I couldn't leave because he was outside of the door."

The following morning, New Year's Day, Charles remained physically close to J.S. and told her she could not leave the house. Early that evening, J.S. testified that she then went to an upstairs window and hung outside the window a piece of paper that stated, "911." J.S. explained that she did so because "I was scared and I knew that I felt as if I didn't do it, then something really bad could possibly happen."

Shamaine Winston testified at trial that she drove past Charles's house, and she saw a young female holding a sign that said "911" outside the second floor window. Winston recalled that the girl pointed to the sign and indicated to Winston to be quiet by holding her finger over her lips. Concerned, Winston then called 911 from her driveway and the police then arrived at Charles's house a short time later.

J.S. testified that sometime after J.S. held up the 911 sign, Charles told her that he was going to go to the store to buy cigarettes, but he would not let J.S. come with him. J.S. testified that she allowed him to put the handcuffs on her so that he would go get cigarettes, but she felt like she "couldn't say no."

The Commonwealth introduced video evidence at trial from one of Charles's security cameras. The footage showed Charles and J.S. talking at the top of the stairs in Charles's home. In one video, J.S. said, "Lock me up, please get cigarettes." J.S. pointed to the handrail at the top of the stairs and said, "Right here." Charles then patted J.S. down as she removed an outer shirt and her pants. J.S. again told Charles, "Please get cigarettes." J.S. held her hand out to the handrail and said, "Really tight." After Charles handcuffed J.S., he checked the floor around her and said, "I just don't get, like, you want to go back to the homeless life when I've--" J.S. interrupted by saying, "Rather than be here," and she repeatedly told him to get cigarettes.

As depicted on the security camera footage, J.S. heard something downstairs, and she asked Charles to open the door before shouting, "Who's there?" J.S. repeatedly asked Charles to go open

- 4 -

the door and "see what it is." J.S. then began screaming, "Open the door!" J.S. testified that after she realized people were outside the front door, she began screaming because she "figured that they were police because they said they were police and I could hear. And Peter [Charles] had a gun on him so I didn't know. I just didn't want anything bad to happen." As police began kicking down the door, Charles scurried up the stairs, sat down next to J.S., then pulled a black pistol out of his pocket, and tossed it behind him.

Officer Elijah Ranson of the Chesterfield County Police testified that he and other officers responded to Winston's 911 call. According to his testimony and body-worn camera footage, Officer Ranson heard a woman screaming as he approached the house. When the police knocked on the front door, J.S. began screaming, "Open the door!" The officers kicked down the door and found J.S. and Charles sitting at the top of the stairs. J.S. was handcuffed to the handrail. As officers gave commands to Charles to come down the stairs, J.S. said, "He's not letting me out," and she also said, "thank you, thank you."

The officers grabbed Charles, patted him down, and escorted him outside. After Officer Warren Ball advised Charles of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), Charles then spoke with Officer Ranson. Charles stated that J.S. was a heroin addict and that she had already taken two of her doses of methadone that the clinic had provided her for the long holiday weekend. Charles was concerned that J.S. would try to leave the house to get heroin, and he stated that J.S. agreed to be handcuffed to the handrail while he left to get cigarettes. Officer Ranson described the layout of Charles's house by using photographs introduced by the Commonwealth. He explained that there was "the master bedroom downstairs," where police officers found multiple firearms and "a piece of white rope that is tied to the wooden bed frame."

In another interview later that day with Detective Bryan Waggoner, Charles described J.S. as manipulative, bipolar, and a drug addict. A video of the interview was admitted into

evidence at trial. During the interview, Charles also stated that J.S. was into "kinky" activities involving handcuffs and is "messed up in the head." Charles confirmed that he told J.S. that he would not allow her to leave the house. He also admitted that he had slept on the floor in front of the bathroom the previous night.

Charles testified in his own defense at trial. He stated that he set ground rules for J.S. to stay with him and that he did not want her leaving the house to get drugs while he was at work. Charles testified that J.S. asked to sleep in the bathroom because it was warmer than the other rooms in the house and that he told her she could stay there if she agreed to be handcuffed and tied to the bed. According to Charles, J.S. agreed to the terms. Charles further testified that J.S. asked to be handcuffed to the handrail so that he could go buy cigarettes. He acknowledged that J.S. asked to leave the house on New Year's Eve and that she packed a bag, but he stated that she did not physically attempt to leave the house.

Charles was charged with abduction in violation of Code § 18.2-47.[2] Before trial, the Commonwealth filed a motion *in limine* to preclude Charles from introducing a nude photograph of J.S., arguing that such a photograph was not relevant. The trial court ruled that the defense could ask J.S. about the photograph, and "[i]f she admits that the photo is there but then gives an explanation for it, then the photo doesn't come in. If she says I never did that, then the photo comes in."

During a break in J.S.'s testimony at trial, the trial judge told counsel that because J.S. had already admitted to voluntarily wearing handcuffs when she was alone in the house there was no reason to introduce the nude photograph. After conferring with his client, defense counsel stated, "I'll leave that. I think [the attorney for the Commonwealth] Ms. Wright's right."

---

[2] Charles was also indicted for use of a firearm in the commission of a felony. The jury found him not guilty of that charge.

Defense counsel stated that he would instead ask J.S. "some other questions" at the "appropriate time."

Among the instructions given to the jury, Instruction 1 provided that to convict Charles of abduction, the Commonwealth must prove beyond a reasonable doubt:

> (1) That the defendant by force, intimidation or deception did seize, take, transport, detain or hide [J.S.], and
>
> (2) That the defendant did so with the intent to deprive [J.S.] of her personal liberty, and
>
> (3) That the defendant acted without legal justification or excuse.

During deliberations, the jury asked the trial court, "What is an excuse?" The trial judge suggested to the parties that it should inform the jury that the court could not define the legal instruction but that the jury must consider it in its entirety. Defense counsel agreed, stating, "Great." The attorney for the Commonwealth asked to add language explaining that words must be given their plain meaning. Defense counsel agreed to the added language, stating, "I don't have any problem with that." The trial court's written answer to the jury stated, "I cannot further define the legal instruction for you, but it must be considered in its entirety. Words must be given their plain meaning." Counsel for Charles did not object to this answer to the jury. The jury subsequently found Charles guilty of abduction, and the trial court convicted him of the offense in accordance with the jury's verdict. Charles now appeals to this Court.

## ANALYSIS

### I. Sufficiency of the Evidence

On appeal to this Court, Charles argues in his first assignment of error that the "trial court erred by convicting [him] of abduction where the evidence established that the alleged victim's detention was part of a consensual arrangement to deter her drug-seeking behavior."

"When reviewing the sufficiency of the evidence, '[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is "plainly wrong or without evidence to support it."'" *Secret v. Commonwealth*, 296 Va. 204, 228 (2018) (alteration in original) (quoting *Pijor v. Commonwealth*, 294 Va. 502, 512 (2017)). "In such cases, '[t]he Court does not ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Id.* (quoting *Pijor*, 294 Va. at 512) (alteration in original). "Rather, the relevant question is whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Williams v. Commonwealth*, 278 Va. 190, 193 (2009) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). "In conducting our analysis, we are mindful that 'determining the credibility of the witnesses and the weight afforded the testimony of those witnesses are matters left to the trier of fact, who has the ability to hear and see them as they testify.'" *Raspberry v. Commonwealth*, 71 Va. App. 19, 29 (2019) (quoting *Miller v. Commonwealth*, 64 Va. App. 527, 536 (2015)).

Under Code § 18.2-47, a person is guilty of abduction when, "by force, intimidation or deception, and without legal justification or excuse, [he] seizes, takes, transports, detains or secretes another person with the intent to deprive such other person of his personal liberty or to withhold or conceal him from any person." *Brown v. Commonwealth*, 74 Va. App. 721, 730-31 (2022). As this Court has stated, a conviction under Code § 18.2-47 "requires only a showing of physical detention of a person, with the intent to deprive him of his personal liberty, by force, intimidation, or deception, without more." *Walker v. Commonwealth*, 47 Va. App. 114, 120 (2005) (citations and internal quotation marks omitted); *see Brown*, 74 Va. App. at 731. "The element of criminal intent may, and often must, be inferred from the facts and circumstances of the case, including the actions of the defendant and any statements made by him." *Marsh v. Commonwealth*, 57 Va. App. 645, 651 (2011) (quoting *Tarpley v. Commonwealth*, 261 Va. 251, 256 (2001)). "To

prove that the defendant intended to deprive the victim of her personal liberty, the Commonwealth must prove that the defendant intended to deny the victim her freedom from bodily restraint." *Burton v. Commonwealth*, 281 Va. 622, 627 (2011).

On the evening of December 31, 2020, Charles used physical objects to prevent J.S. from leaving the bathroom in his house. He placed handcuffs on her, he tied a rope from the handcuffs to his bedframe, he locked the bathroom door, and he also used his own body to block her coming through the bathroom door. The jury was entitled to infer from Charles's actions that he intended to use force to deprive J.S. of her personal liberty when he took those steps to keep J.S. locked in his bathroom. *See Walker*, 47 Va. App. at 120; *Brown*, 74 Va. App. at 731. Furthermore, the jury could credit J.S.'s testimony that Charles restrained her after she told him that she wanted to leave that night, that she had packed a bag to leave his house, and that she physically attempted to leave the house before Charles stepped in front of her. In addition, the jury could credit J.S.'s testimony that she argued with Charles about his refusal to let her out of the bathroom that night – and that Charles did not release her from the bathroom until the following morning. The jury could also conclude that J.S.'s testimony was corroborated by Charles's own admission to Detective Waggoner that Charles slept in front of the bathroom door while J.S. was handcuffed inside.

Furthermore, the jury was not required to accept Charles's testimony that J.S. asked to sleep in the bathroom. As this Court has explained, "In its role of judging witness credibility, the fact finder is entitled to disbelieve the self-serving testimony of the accused and to conclude that the accused is lying to conceal his guilt." *Speller v. Commonwealth*, 69 Va. App. 378, 388 (2018). In short, the jury was entitled to believe J.S.'s testimony and to reject the claim that she consented to be detained in Charles's bathroom all night.

The jury saw and heard the evidence that established the totality of the circumstances here – including J.S.'s testimony, Charles's statements, actions, and admissions, combined with other witness testimony, video evidence from Charles's security cameras, and body-worn camera footage from the police officers. As described *supra*, the evidence in the record was sufficient to support the jury's implicit finding that Charles acted with the intent to deprive J.S. of her personal liberty when he physically prevented her from leaving his house despite J.S.'s asking to leave and physically attempting to leave. Consequently, we certainly cannot say that no rational factfinder could conclude that Charles used force to detain J.S. with the requisite intent in violation of Code § 18.2-47. *See Walker*, 47 Va. App. at 120; *Brown*, 74 Va. App. at 731.

## II. The Jury's Question and the Admission of Evidence

In his second assignment of error, Charles contends that the trial court erred by "failing to directly answer a jury question regarding the definition of legal 'excuse' contained in the instruction defining the crime of abduction." Although counsel for Charles agreed to the trial court's answer to the jury's question at trial, Charles now asks this Court to invoke the "ends of justice" exception to Rule 5A:18 to conclude that the trial court's answer was in error. In his third assignment of error, Charles contends that the trial court erred by not allowing the admission of a nude photograph of J.S wearing handcuffs.

"One of the tenets of Virginia's jurisprudence is that trial counsel must timely object with sufficient specificity to an alleged error at trial to preserve that error for appellate review." *Perry v. Commonwealth*, 58 Va. App. 655, 666 (2011). As stated in the Rules of the Supreme Court of Virginia, "No ruling of the trial court . . . will be considered as a basis for reversal unless an objection was stated with reasonable certainty at the time of the ruling, except for good cause shown or to enable this Court to attain the ends of justice." Rule 5A:18.

"'The ends of justice exception is narrow and is to be used sparingly,' and applies only in the extraordinary situation where a miscarriage of justice has occurred." *Holt v. Commonwealth*, 66 Va. App. 199, 209 (2016) (en banc) (quoting *Redman v. Commonwealth*, 25 Va. App. 215, 220-21 (1997)). Whether to apply the ends of justice exception involves two questions: "(1) whether there is error as contended by the appellant; and (2) whether the failure to apply the ends of justice provision would result in a grave injustice." *Commonwealth v. Bass*, 292 Va. 19, 27 (2016) (quoting *Gheorghiu v. Commonwealth*, 280 Va. 678, 689 (2010)). "The burden of establishing a manifest injustice is a heavy one, and it rests with the appellant." *Holt*, 66 Va. App. at 210 (quoting *Brittle v. Commonwealth*, 54 Va. App. 505, 514 (2009)). "In order to avail oneself of the exception, [the appellant] must affirmatively show that a miscarriage of justice has occurred, not that a miscarriage *might* have occurred." *Id.* (alteration in original) (quoting *Redman*, 25 Va. App. at 221).

The record before us on appeal does not warrant application of the ends of justice exception to Rule 5A:18. Counsel for Charles specifically agreed to the trial court's answer to the jury's question. He agreed with the trial court's answer by stating, "Great." When the attorney for the Commonwealth sought to add another sentence to the answer, defense counsel stated, "I don't have any problem with that." Similarly, Charles abandoned his objection to the trial court's ruling on the admissibility of the nude photograph. Defense counsel acknowledged, "I think [the attorney for the Commonwealth] Ms. Wright's right." Although defense counsel stated that he would ask J.S. some other questions at the "appropriate time," he did not ask J.S. questions about the nude photograph.

"A party may not approbate and reprobate by taking successive positions in the course of litigation that are either inconsistent with each other or mutually contradictory." *Cangiano v. LSH Bldg. Co.*, 271 Va. 171, 181 (2006). As the Supreme Court has stated, "The doctrine

protects a basic tenet of fair play: No one should be permitted, in the language of the vernacular, to talk through both sides of his mouth." *W. Refin. Yorktown, Inc. v. Cnty. of York*, 292 Va. 804, 826 (2016) (quoting *Wooten v. Bank of Am., N.A.*, 290 Va. 306, 310 (2015)). In short, a party cannot attempt to take advantage on appeal of a ruling by the trial court to which that party agreed or did not object while before the trial court. In addition, "there is no 'ends of justice' exception to the approbate and reprobate doctrine." *Nelson v. Commonwealth*, 71 Va. App. 397, 405 (2020). "The approbate-reprobate doctrine is broader and more demanding than Rule 5A:18." *Alford v. Commonwealth*, 56 Va. App. 706, 709 (2010). Thus, regardless of Rule 5A:18, Charles is precluded now on appeal from asserting that the trial court erred in its answer to the jury's question. He also likewise cannot contest the trial court's ruling on the admissibility of the photograph. "The very fact that" Charles agreed with the trial court's decisions "renders Rule 5A:18's . . . exception[s] inapplicable." *Nelson*, 71 Va. App. at 406 (quoting *Alford*, 56 Va. App. at 709). "'It can hardly be a "grave injustice" to a defendant's essential rights for a trial court to [make] an agreed-upon [ruling].'" *Id.* at 405 (alterations in original) (quoting *Alford*, 56 Va. App. at 709). Consequently, we cannot reach the merits of Charles's second and third assignments of error.

CONCLUSION

For all of the foregoing reasons, we do not disturb the judgment of the trial court, and we uphold Charles's conviction for abduction.

*Affirmed.*